The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Chapman and the briefs and oral arguments of the parties. The appealing party has not shown good grounds to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award.
***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in a Pretrial Agreement and at and after the hearing as
 STIPULATIONS
1. Employee is Conrad C. Benton.
2. Employer is International Paper.
3. The carrier on the risk at the time of the alleged injury by accident was Wausau Insurance Companies.
4. Employer regularly employs three or more employees and is bound by the North Carolina Workers' Compensation Act. The employer-employee relationship existed between the employer and the employee in February 1996, the alleged date of onset.
5. The average weekly wage will be determined from a Form 22 to be submitted by defendants at the hearing.
6. Plaintiff's claim is for bilateral carpal tunnel syndrome arising out of the scope and course of this employment, which claim defendants have denied as compensable.
In addition, the parties stipulated into evidence a packet of documents submitted on February 11, 1999 which contained Industrial Commission forms, medical records and vocational records.
The Pre-Trial Agreement dated June 23, 1998 submitted at the hearing is incorporated by reference. The medical reports and documents attached to the Pre-Trial Agreement were stipulated into evidence.
The depositions of Dr. Cromer and Dr. Ogden were subsequently submitted for review and received into evidence. In addition, after the hearing, the parties stipulated additional medical reports and vocational reports into evidence.
***********
The Full Commission adopts the findings of fact found by the Deputy Commissioner and finds as follows
 FINDINGS OF FACT
1. Plaintiff, who is fifty-six years old and who went to school to the twelfth grade, began working for defendant-employer's predecessor in November 1966. During the next approximately 12 years he worked in several different capacities at the paper mill. He then became a pipe fitter helper and worked in that position for approximately 2 years before being promoted to the position of pipe fitter, the job he held until the date of hearing before Deputy Commissioner Chapman.
2. As a pipe fitter, plaintiff would perform work involving routine maintenance, unscheduled repairs and, in some instances, new pipe construction. Many tools were required by the pipe fitters. The pipes they worked with varied from 1/2 inch to 36 inches in diameter. The large pipes required chain hoists or "come alongs" to be transported. When performing repairs or replacing old pipe, plaintiff would have to cut, grind and thread the pipe, remove large bolts, tighten flanges, and bolts, replace gaskets and help to maneuver large pipes or other pieces of machinery or equipment. Wrenches were the most commonly used tools and he would have to exert considerable force on them to tighten or loosen bolts and flanges. He also used channel locks, hammers, screwdrivers, hacksaws and pliers to perform his job duties.
3. The pipe fitters did not have a consistent workload except during plant shutdowns. There would usually be times during the day when they would be waiting for an assignment or for tools, equipment or supplies to be delivered. However, when working on an assignment, they were required to use their hands and wrists forcibly with extreme extension and flexion of the wrists, and often from awkward positions.
4. In early 1996 plaintiff began to develop a tingling sensation in the thumb, index, middle and ring fingers of both hands. During the next year he gradually developed increasing symptoms of numbness and pain and nighttime symptoms. On February 17, 1997 he went to the plant nurse and advised her of his problems. In March 1997 he went to Dr. Forstner who prescribed anti-inflammatory medication. After he filed a Form 18 in April 1997, the company nurse directed him to see Dr. Cromer, an occupational specialist who came to the plant each week. Dr. Cromer examined him on April 16, 1997 and was of the impression that he had carpal tunnel syndrome. The plant doctor recommended that he follow Dr. Forstner's recommendations and his condition improved somewhat with the medication and splints prescribed. By June 1997 he was more concerned about symptoms in his upper back and shoulder area than in his hands.
5. Dr. Cromer then referred plaintiff to Dr. Sutton, an orthopedic surgeon, for evaluation of the subscapular pain and plaintiff was treated for that condition until August 1997 when the symptoms improved. However, he was still bothered with pain and numbness in his hands and in September 1997 asked Dr. Cromer to refer him to Dr. Ogden, an orthopedic hand surgeon. On October 1, 1997, plaintiff was seen by Dr. Motley, a partner of Dr. Ogden's. Dr. Motley diagnosed plaintiff's condition as bilateral carpal tunnel syndrome from repetitive overuse syndrome and recommended further conservative treatment. The doctor advised plaintiff to wear his splints at work if possible but plaintiff's normal job duties would not allow for that limitation.
6. Plaintiff's symptoms persisted despite conservative treatment. Therefore, on January 27, 1998, when Dr. Ogden examined him, surgery was recommended. Dr. Ogden performed a right carpal tunnel release on February 10, 1998 and then performed surgery on the left hand on March 9, 1998. Following the operations, plaintiff experienced significant improvement in his symptoms, particularly the numbness. However, when he attempted to return to work in May 1998, he could not perform his duties due to weakness and pain. Dr. Ogden and Dr. Cromer took him back out of work and sent him to therapy. At plaintiff's request, Dr. Cromer allowed him to return to work at light-duty in July 1998. According to the medical evidence, he was subsequently able to resume his regular duties with a few modifications. However, by November 1998 he was experiencing a relapse and requiring further restrictions. He remained under medical care at that time.
7. As of February 1997, plaintiff developed bilateral carpal tunnel syndrome. The totality of the medical evidence establishes by the greater weight that plaintiff was placed at an increased risk of developing carpal tunnel syndrome due to his repetitive hand activities at work as compared to the general public not so employed. Furthermore, the evidence of record establishes by the greater weight that his job activities were a significant contributing factor in the development of his carpal tunnel syndrome.
8. Plaintiff's bilateral carpal tunnel syndrome is an occupational disease which is due to causes and conditions characteristic of and peculiar to his employment with defendant-employer and which is not an ordinary disease of life to which the general public is equally exposed.
9. As a result of his occupational disease, plaintiff was unable to work from February 10, 1998, when he underwent surgery, through May 17, 1998 and from May 29, 1998 through the date of hearing before Deputy Commissioner Chapman on June 23, 1998 and continuing.
10. Plaintiff had not reached maximum medical improvement with respect to this occupational disease at the close of the evidentiary record.
11. Based upon the Form 19, plaintiff's average weekly wage is $872.80. A Form 22 was not submitted by the parties.
***********
Based upon the foregoing stipulations and findings of fact, the Full Commission concludes as follows
 CONCLUSIONS OF LAW
1. As of February 1998, when he first became disabled, plaintiff developed bilateral carpal tunnel syndrome which was an occupational disease due to causes and conditions characteristic of and peculiar to his employment and which was not an ordinary disease of life to which the general public was equally exposed. G.S. § 97-53 (13). Booker v. Duke Medical Center,297 N.C. 458 (1979).
2. Plaintiff is entitled to compensation at the rate of $532.00 per week for 17 and 4/7 weeks for the temporary total disability he sustained as a result of this occupational disease up to the date of hearing on June 23, 1998. Furthermore, he is entitled to continuing temporary total disability compensation after that date for as long he remains unable to earn the same or greater wages or until further order of the Commission. G.S. § 97-29.
3. Subject to G.S. § 97-25.1, plaintiff is entitled to have defendants provide all necessary medical compensation arising from this occupational disease which tends to effect a cure, provide relief or lessen the period of plaintiff's disability. G.S. § 97-2(19); § 97-25; § 97-25.1 and § 97-59.
***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission adopts and affirms the holding of the Deputy Commissioner and enters the following
 AWARD
1. Defendant shall pay compensation to plaintiff for temporary total disability at the rate of $532.00 per weeks for 17 and 4/7 weeks for the periods through June 23, 1998, and shall continue to pay compensation thereafter for as long as he is unable to earn the same or greater wages or until further order of the Commission. The compensation which has accrued shall be paid in a lump sum subject to the attorney's fee hereinafter approved.
2. Subject to § 97-25.1, defendants shall pay all medical expenses incurred by plaintiff as a result of his occupational disease.
3. An attorney's fee in the amount of twenty-five percent of the compensation awarded is hereby approved for plaintiff's counsel, which fee shall be deducted from the aforesaid award and paid directly to Ms. Glancy.
4. Defendants shall pay the costs due the Commission.
S/_____________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
S/_____________ THOMAS J. BOLCH COMMISSIONER
S/_____________ CHRISTOPHER SCOTT COMMISSIONER
DCS:nwg